UNITED STATES DISTRICT COURT

Northern District of California

ROY FLUGENCE,

               Plaintiff,

  v.

CITY AND COUNTY OF SAN FRANCISCO, *et al.*,

               Defendants.
_____/

No. C 12-00437 MEJ

**ORDER RE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
[Dkt. No. 15]

## I. INTRODUCTION

Plaintiff Roy Flugence filed this action pursuant to 42 U.S.C. § 1983, asserting claims against his former employer and supervisors for violation of his First, Fourth, and Fourteenth Amendment rights. Complaint, Dkt. No. 1 ("Compl."), at 6-7. Plaintiff alleges that Defendants discriminated against him because he is African-American and unlawfully terminated his employment, denying him his due process rights. *Id.* at 23. Defendant City & County of San Francisco, San Francisco Municipal Transit Agency ("SFMTA"), Nathaniel Ford, and George Louie now move for summary judgment on Plaintiff's claims. Dkt. No. 15 ("Mot."). Plaintiff initially failed to file any opposition to Defendants' Motion, as well as failed to attend the scheduled July 25, 2013 hearing on the Motion. The Court ordered Plaintiff to Show Cause for these actions (Dkt. No. 30), and after receiving Plaintiff's response (Dkt. No. 31) and a late-submitted opposition to Defendant's motion (Dkt. No. 32, "Opp."), the Court permitted proceedings on Defendant's motion to move forward. Dkt. No. 34. Defendant timely filed its Reply in support of its motion. Dkt. No. 36 ("Reply"). Because the Court finds this matter suitable for disposition based on the parties' written submissions, and oral argument would not assist the Court in making this decision, the Court **VACATES** the hearing set in this matter on December 5, 2013. Civil L.R. 7-1(b). After carefully considering the parties' arguments

and controlling authorities, the Court now **GRANTS** summary judgment in favor of Defendants.

## II. BACKGROUND

Except where indicated, the following facts are undisputed:

Plaintiff is an African-American male who was previously employed as a Transit Operator for the SFMTA, an agency of the Defendant City & County of San Francisco. Compl. ¶ 3-5, 15. As a Transit Operator, he operated SFMTA's 45-foot trolly and motorized buses. Dkt. No. 15-4, Declaration of Andrew Gschwind in Support of Defendant's Motion for Summary Judgment ("Gschwind Decl."), Ex. A, Deposition of Roy Flugence ("Flugence Dep.") 20:8-16 (Dec. 13, 2013).

SFMTA Transit Operators are "safety sensitive employees" as defined by United States Department of Transportation ("DOT") regulations. Dkt. No. 15-3, Declaration of William "Reggie" Smith in Support of Defendant's Motion for Summary Judgment ("Smith Decl.") ¶ 2. In order for the City to receive federal transportation funding, DOT requires that SFMTA conduct drug testing of its safety sensitive employees in accordance with DOT rules and regulations. *Id*. SFMTA receives such funds and drug tests its employees in accordance with DOT drug testing rules and regulations. *Id*. SFMTA has enacted its drug testing rules and procedures based on DOT regulations, set forth in the SFMTA Employee Handbook distributed to Transit Operators. *Id*. ¶ 3 & Ex. A (SFMTA Substance Abuse Policy and SFMTA Testing Procedures). Section 8.4 of the SFMTA Substance Abuse Policy states:

> A refusal to submit to testing (a "refusal") is treated the same as a positive test. The following conduct constitutes a refusal.
> • Failing to appear for any test within a reasonable time (except for preemployment tests)
> • Failure to remain at the testing site until the test has been completed . . . .
> • Failure to cooperate with any part of the testing process, including obstructive or abusive behavior (refusal to drink water is not a refusal to test)
> • Failure to provide adequate urine or breath and subsequent failure to undergo a medical examination as required for inadequate breath or urine . . . .
> • Failure to sign Step 2 of the alcohol test form (ATF) . . . .

Smith Decl., Ex. A at PDF 16[1] (SFMTA Substance Abuse Policy at 8 of 17), § 8.4.

---

[1] Smith's Declaration contains two separate documents in one exhibit (Ex. A): both SFMTA's Substance Abuse Policy and its Testing Procedures. For clarity, the Court first refers to the PDF page numbers of the entire exhibit, then refers in parentheticals to the page numbers

2

SFMTA Drug Specimen Collection Procedures specify that an employee must provide a urine specimen of at least 45 milliliters. Smith Decl., Ex. A at PDF 28 (SFMTA Testing Procedures at 2 of 27, ¶ 4.h-j). The Collection Procedures further states:

> If the individual is unable to produce such a quantity of urine, the collector shall instruct the individual to drink not more than 40 ounces of fluids. . . . The individual has up to three hours to provide a complete sample using a fresh collection container. The employee may not leave the test area during the three hour period and will be monitored during that period by testing personnel. . . .

*Id.* at ¶ 4.j.

On November 11, 2009, Plaintiff failed a random drug test when he tested positive for cocaine, and was immediately taken off-duty. Smith Decl. ¶ 4; Flugence Dep. 19:11-18. Plaintiff does not contest this test or test result. Flugence Dep. 19:15-18; Compl. ¶ 26.

On November 17, 2009, Plaintiff met with SFMTA's certified Substance Abuse Professional, William "Reggie" Smith. Smith Decl. ¶ 5; Flugence Dep. 23:12-20. Smith conducted a chemical dependency assessment and interview and enrolled Plaintiff in a substance abuse treatment program. Smith Decl. ¶ 5; Flugence Dep. 23:12-20; 24:6-7. Plaintiff attended this treatment program as directed and, on December 23, 2009, tested clean for drugs and alcohol. Smith Decl. ¶ 6; Flugence Dep. at 23-24.

On December 29, 2009, Smith met with Plaintiff to evaluate whether he should be allowed to return to work and operate SFMTA buses. Smith Decl. ¶ 6. At this meeting, in exchange for the City's agreement not to terminate Plaintiff and to allow Plaintiff to return to work, Plaintiff signed a last chance agreement, entitled "Recovery Agreement." Smith Decl. ¶ 6 & Ex. B. The Agreement provided that: (a) Plaintiff would abstain from all mood altering substances, including alcohol and drugs, for a period of five years; (b) Plaintiff would be tested for drugs and alcohol on an unannounced basis; and (c) any positive test result or violation of DOT/SFMTA drug testing rules would violate the Agreement and constitute just cause for termination. *Id.* Smith went over the Agreement in detail with Plaintiff during their meeting. Smith Decl. ¶ 6.

---

provided in the individual documents.

3

On the morning of January 5, 2010, sometime between 10 a.m. and 11 a.m., Plaintiff was notified by radio that he was to immediately report for a follow-up drug test. Flugence Dep. 50:3-16, 124:15-125:25. Plaintiff reported to the dispatcher at his division (Potrero Division) for his drug test at approximately 11:45 a.m. Flugence Dep. 66:8-16; Dkt. No. 15-2, Declaration of Nathaniel P. Ford in Support of Defendant's Motion for Summary Judgment ("Ford Decl."), Ex. B at PDF 19.[2] Plaintiff then reported to the mobile drug testing vehicle, a recreational vehicle or "RV." Flugence Dep. 70:14-19.

Plaintiff and the Certified Professional Collector/Breath Alcohol Tester, Kenneth Porter, have differing accounts regarding what happened after Plaintiff showed up at the drug testing vehicle for drug testing. According to Porter, when Plaintiff came into the RV, Plaintiff said that he did not have to urinate and asked Porter if he was required to log the time that Plaintiff finished with the test. Ford Decl., Ex. B at PDF 18 ("Report on Refusal - Operator 1870"). Porter says that he told Plaintiff "yes," and Plaintiff responded "can you pretend you never seen me." *Id.* Porter then explained to Plaintiff that the "dispatcher puts the time on the form and you should report within 5-10 minutes after the time you are notified." *Id.* Plaintiff responded again that he could not urinate and also said that he did not want to do his "second half."[3] *Id.* Porter replied that Plaintiff would first need to try to give a urine sample and that, if he could not, he would then need to stay in his sight until he gave a sample. *Id.* Porter indicated that Plaintiff responded, "[j]ust pretend you did not see me," and walked out of the RV. *Id.* Porter says he "did not in any way suggest to [Plaintiff] that I would pretend not to have seen him would be ok." *Id.*

Plaintiff testified about these events two times: at arbitration and in his deposition. According to Plaintiff's arbitration testimony, when he first entered the RV, he told Porter that he could not/was not able to give a sample at that time. Dkt. No. 15-2, Ford Decl., Ex A, Arbitration Opinion ("Arb.

---

[2] Multiple documents were combined into this exhibit as well. For clarity, the Court will again refer to the PDF page numbers.

[3] According to the City, this statement indicates that Plaintiff did not want to finish the second part of his shift. Mot. at 4.

4

Opin.") at 4; Flugence Dep. 54:17-23; 62:7-63:9.  Porter then told Plaintiff that he had three hours to produce a sample and that Plaintiff should drink some water.  *Id.* at 54:23-55:1; 62:7-63:20; Arb. Opin. at 4.  Plaintiff responded that he just needed to walk around a bit.  *Id.*; Flugence Dep. 55:1-2; 62:11-14; 62:23-25; 63:21-23.  During his arbitration testimony, Porter testified that Plaintiff then asked if he could "pretend" he had not see Plaintiff, and that told Porter he would come back.  Arb. Opin. at 4.  Plaintiff testified at the arbitration that Porter told him, "I can pretend that you weren't here yet."  Arb. Opin. at 4.  At this deposition, Plaintiff testified that Porter told him that normally you're supposed to stay around, but I will pretend that I didn't see you.  Flugence Dep. 55:3-4; 63:4-9; 64:3-9; 64:19-25; 79:11-13.  Plaintiff left the van, walked around in the area of the van.  Arb. Opin. at 4.  At arbitration, Plaintiff testified he was walking around for about an hour and a half.  Arb. Opin. at 4; Compl. ¶ 29.  At his deposition, Plaintiff testified he was walking for less than an hour when he noticed the van starting to move.  Flugence Dep. 55:7-8.  Elsewhere, Plaintiff testified that the van left fifteen to thirty minutes after he first reported to Porter.  Flugence Dep. 70:20-71:1.

Plaintiff went to the van and asked Porter if he was leaving.  Arb. Opin. at 4;  Flugence Dep. 55:7-12; 80:2-16.  Plaintiff testified that he told Porter he was there to test and he was ready to produce a sample.  Flugence Dep. 55:7-12; 80:17-21.  Porter told Plaintiff that he had been instructed to go to another SFMTA division (Kirkland Division) and that Plaintiff needed to talk to his dispatcher.  Arb. Opin. at 4; Flugence Dep. 55:7-12; 80:17-21.  Plaintiff went to the Dispatcher, who then told him to go see his Union representative, who was on-site.  *Id.* at 55:12-25; 71:16-24.

According to Plaintiff's arbitration testimony, his Union representative advised him to go to Kirkland to complete his test, where Plaintiff again tried to provide Porter with a urine sample, but Porter told Plaintiff that he had not been dispatched there and therefore, he could not be tested at that location.  Arb. Opin. at 4; Compl. ¶ 30.  In his deposition, Plaintiff testified that after he was taken off duty, he immediately went to an independent testing site, "Accurate Drug and DNA testing," to complete a urine sample.  Flugence Dep. 84:4-85:3; 109:22-12; 168:11-15.  But Plaintiff testified that he was not permitted to give a sample, allegedly because SFMTA Drug Testing Coordinator Chuckwana Ogbonna told the testing company not to take a sample from Plaintiff.  *Id.* at 85:2-25.

It is undisputed that at approximately 1:45 p.m. on January 5, 2010, Coordinator Ogbonna filled out a "Failure to Test as Scheduled" form that the Potrero Division Dispatcher signed, and Plaintiff was immediately taken off duty. Ford Decl., Ex. B at PDF 19 ("Failure to Test as Scheduled" form). This failure to test is considered a refusal to test, which in turn is treated as a second positive. Ford Decl., Ex. B at PDF 20-21 ("Second Positive (Refusal)" and "Notification of Positive Test"); Arb. Opin. at 4.

On January 6, 2010, the morning after he was taken off duty, SFMTA served Plaintiff with a notice of proposed termination and supporting *Skelly* packet. Ford Decl., Ex. B at PDF 15 ("Proposed Recommended Disciplinary Action - Dismissal") and Ex. C (*Skelly* Decision). The Superintendent of Plaintiff's division, George Louie, conducted an initial disciplinary hearing that same day. Ford Decl., Ex. C at 2. Plaintiff and his Union Chairperson, Jean Ellis-Jones attended the hearing, and Plaintiff denied refusing to test. *Id*. After the hearing, Superintendent Louie issued a written opinion/recommendation that the SFMTA move forward with its proposed termination. *Id*. That evening, Plaintiff took a drug test, and the test was negative for cocaine or any other illegal substance. Arb. Opin. at 4; Flugence Dep. 129:5-130:12 and Ex. D (test results). Pursuant to the Memorandum of Understanding ("MOU") between Plaintiff's Union and the City, the Union requested a Step 3 grievance hearing shortly afterward. Dkt. No. 15-1, Declaration of Cris Iborra in Support of Defendant's Motion for Summary Judgment ("Iborra Decl.") ¶ 4.

On February 10, 2010, a Step 3 hearing was held on before SFMTA Hearing Officer Mike Helms regarding the City's proposed termination of Plaintiff. *Id*. Plaintiff was again represented by his Union at this hearing. *Id*. In a written decision dated February 22, 2010, the SFMTA hearing officer denied the Union's grievance and upheld the termination. Ford Decl., Ex. D (Step 3 Hearing Decision). The Union appealed.

On February 23, 2010, a Step 4 non-binding arbitration hearing was held before Arbitrator Alexander Cohn. Iborra Decl. ¶ 5 & Ex. A (MOU) ¶ 327. Plaintiff appeared with his Union representative, Rafael Cabrera, and testified. Iborra Decl. ¶ 5. Mr. Iborra appeared on behalf of the City/SFMTA, and third-party Kenneth Porter testified briefly. *Id*.

On March 5, 2010, the arbitrator issued his non-binding written opinion. Arb. Opin. In his opinion, the arbitrator noted that "[t]his is a particularly nettlesome case" and a "particularly close case." *Id.* at 6, 8. Although the arbitrator accepted that Plaintiff had a "shy bladder" on January 5 and should have been allowed three hours to provide a urine sample, he also found that Plaintiff violated SFMTA/DOT policy by leaving the testing vehicle. *Id.* at 8. The arbitrator recommended that Plaintiff be suspended for ten business days without pay. *Id*. The opinion stated that (in the future) Plaintiff's December 2009 last chance agreement should be "strictly enforced." *Id*. at 9. The opinion mentioned that Plaintiff did not try to give a urine sample when he first reported to the RV, as required by SFMTA and DOT procedure, in a footnote. *Id*. at 4, n.1. The arbitrator believed that Plaintiff's credibility was bolstered by the fact that: (a) Plaintiff testified that he traveled to Kirkland Division later in the day on January 5 to again try to give a urine sample to Mr. Porter (Arb. Opin. at 6 - 7); and (b) Plaintiff testified that he tested clean "the very next day" (*Id*. at 6).

Pursuant to the MOU between Plaintiff's Union and the City, after the Step 4 arbitration hearing, "[t]he SFMTA Executive Director/CEO or his/her designee shall exercise his/her discretion in accepting, modifying, or rejecting the [Arbitrator's] recommended decision." Iborra Decl., Ex. A (MOU at *45, ¶ 327). In a letter dated March 29, 2010, the SFMTA Executive Director/CEO, Nathaniel Ford, notified Plaintiff that he was exercising his discretion and rejecting the arbitrator's recommended award and would terminate Plaintiff instead. Ford Decl., Ex. E. Ford is African-American, and said that he did not know Plaintiff's race or consider race in determining his response to the arbitrator's opinion. Ford Decl. ¶ 4. In his letter to Plaintiff, Ford stated that even if Plaintiff had a shy bladder as claimed, "[t]he Union was unable to provide evidence as to the reasons a 'shy bladder' allowed [Plaintiff] to leave the testing site and that behavior alone violated the testing regulations and warranted a second positive test result." Ford Decl., Ex. E at 2. Ford also found that, "Mr. Cabrera also did not present an answer for your curious words to the collector, 'Just pretend you did not see me,' before leaving the testing van." *Id*. Mr. Ford thus concluded:

> Based on your failure to comply with all facets of the Municipal Transportation Agency Substance Abuse Policy and San Francisco Municipal Railway Rules and Instructions, Rule 2.11.4, I believe that arbitrator made an incorrect decision. Hence, it is my decision to reject the Arbitrator's recommendation and instead uphold the

7

Skelly Decision to dismiss you from your position as a 9163 Transit Operator[.]
*Id.* On April 7, 2010, the SFMTA informed Plaintiff via letter that he was dismissed from his employment effective the close of business that day. Compl. ¶ 32.

During the five years that Ford was Executive Director/CEO of the SFMTA, on average he reviewed fifteen to twenty Step 4 arbitration opinions each year concerning Transit Operators who had been charged with termination (75-120 opinions in total). Ford Decl. ¶ 8. During this five year period, he only rejected the arbitrator's recommendation between five to seven times in total, and the vast majority of the time he accepted the proposed award. *Id.*

### III.  LEGAL STANDARD

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). All reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the moving party does not bear the burden of proof at trial, it is entitled to summary judgment if it can demonstrate that "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party meets its burden, the burden shifts to the nonmoving party opposing the motion, who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Summary judgment is warranted if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson*, 477

1  U.S. at 248. There is no genuine issue of fact "[w]here the record taken as a whole could not lead a
2  rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio*
3  *Corp.*, 475 U.S. 574, 587 (1986).

4  It is not the Court's task "to scour the record in search of a genuine issue of triable fact."
5  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Counsel has an obligation to lay out their
6  support clearly. *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).
7  The Court "need not examine the entire file for evidence establishing a genuine issue of fact, where
8  the evidence is not set forth in the opposing papers with adequate references so that it could
9  conveniently be found." *Id*.

## IV.  DISCUSSION

As indicated above, in his Complaint, Plaintiff asserts that the Defendants violated his Fourteenth Amendment due process rights and denied him equal protection based on his race. Compl. at 6. Defendants argue that Plaintiff has failed to adduce any evidence to sustain his claims.

**A.     Equal Protection Claim**

In his first and second claims, Plaintiff asserts that Defendants, acting pursuant to a policy, denied him equal protection of the law because he is African-American. Compl. at 6; Dkt. No.. Defendants argue that the record is lacks any evidence to support Plaintiff's claim. The Court agrees.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998); *see also*, *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).

Here, it is undisputed that Plaintiff, as an African-American, is a member of a protected class. However, there is no evidence before the Court raising a triable issue of fact as to whether

9

Defendants intentionally discriminated against him at any point during the grievance process or in deciding to terminate his employment because of his race. At most, Plaintiff has alleged in his Complaint that the "de facto policy at San Francisco . . . favors non-black males." Compl. ¶ 14. Plaintiff has failed to come forward with any evidence to support this conclusory charge. In particular, as Defendants point out, there is no evidence that any SFMTA or City employee harbored any racial bias or animus toward Plaintiff. Mr. Ford, the SFMTA Executive Director/CEO who ultimately decided to terminate Plaintiff, stated in his Declaration that he does not know Plaintiff or his race and did not take race into account when reviewing the arbitration opinion. Ford Decl. ¶ 4.

In sum, there is no evidence creating a triable issue of fact on Plaintiff's equal protection claim. The Court therefore **GRANTS** summary judgment in favor of Defendants on this claim.

**B.     Procedural Due Process Claim**

With respect to Plaintiff's procedural due process claim, Plaintiff asserts that he was "not given the type of procedural due process that is afforded person with a protected property interest in their public employment." Opp. at 5. He contends that despite "prevail[ing] at arbitration, . . . the arbitrary and capricious manner of his discharge from employment by Ford on April 7, 2010, rendered the entire grievance procedure a sham." *Id.* Defendants counter that Plaintiff was never denied any hearing rights, but instead was provided with all the procedures provided for in the MOU negotiated between his Union and the City in challenging the City's proposed termination of his employment. Mot. at 10.

Procedural due process claims require: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections. *Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003) (citing *Hufford v. McEnaney*, 249 F.3d 1142, 1150 (9th Cir. 2001)). Plaintiff's claim thus first depends on a finding that he had a protected property interest in his employment with the City, a finding that Defendants do not dispute. Mot. at 10 ("The City does not dispute that Plaintiff, a permanent civil service employee, had a protected property in his continued employment with the City, *see Cleveland v. Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-539" (1985)). Assuming that Plaintiff did have a constitutionally protected property interest in his

10

1 employment, the next issue is whether Plaintiff was denied adequate procedural protections.

2 "When a public employee is terminated for cause, he is entitled to 'oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.'" *Hufford*, 249 F.3d at 1151 (quoting *Loudermill*, 470 U.S. at 546). "A predeprivation hearing serves only as 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges are true and support the proposed action.'" *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 985 (9th Cir. 1998) (quoting *Loudermill*, 470 U.S. at 545-46). The pre-termination hearing need not be elaborate—"the root of this requirement is that an individual have the opportunity to be heard before he is deprived of his property interest." *Walls v. Cent. Contra Costa Transit Auth.*, 653 F.3d 963, 968 (9th Cir. 2011) (citing *Loudermill*, 470 U.S. at 542).

Here, on the morning after it took Plaintiff off duty, SFMTA served Plaintiff a notice of proposed termination of his employment and the grounds for such termination in a supporting *Skelly*[4] packet. *See* Ford Decl., Ex. B (Letter re: "Proposed Recommended Disciplinary Action - Dismissal"). Defendants assert that after Plaintiff received his *Skelly* packet, he had three different hearings of varying formality and length to testify on his behalf, bring representatives and witnesses, and cross-examine adverse witnesses. Mot. at 9-10. First, the Superintendent of Plaintiff's division, George Louie, conducted an initial disciplinary hearing, to which both Plaintiff and Plaintiff's Union Chairperson attended. *Id.* at 6. Second, pursuant to the MOU between Plaintiff's Union and the City, the Union requested, and Plaintiff attended, a "Step 3" grievance hearing on February 10, 2010, before SFMTA Hearing Officer Mike Helms. *Id.* (citing Iborra Decl. ¶ 4). Plaintiff was again represented by his Union at this hearing. Mot. at 6. When the Hearing Officer denied the grievance

---

[4] California law provides for a public employee's right to a pre-termination hearing. In *Skelly v. State Pers. Bd.*, 15 Cal.3d 194, 215 (1975), the Supreme Court of California held that "due process does mandate that the employee be accorded certain procedural rights before" being removed. At a minimum, these pre-removal safeguards must include "notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the right to respond, either orally or in writing, to the authority initially imposing discipline." *Id.*

11

and upheld the termination, the Union appealed. *Id.* Thus, Plaintiff proceeded to a "Step 4" non-binding arbitration hearing before an arbitrator on February 23, 2010. *Id.* (citing Iborra Decl. ¶ 5 and Dkt. No. 15, Ex. A (MOU) ¶ 327). Plaintiff appeared with his Union representative and testified. Mot. at 6. Third-party Kenneth Porter also testified as well. *Id.*

Just as all of these hearings were pursuant to the MOU Plaintiff's Union had with the City, so was the decision of SFMTA Executive Director/CEO, Nathaniel Ford, to exercise his discretion and rejected the arbitrator's recommended award. Mot. at 7 (citing Ford Decl., Ex. E); *see also* Dkt. No. 15, Ex. A (MOU) ¶ 327. As Defendants note, "[a] public employer may meet its obligation to provide due process through grievance procedures established in the collective bargaining agreement, provided, of course, those procedures satisfy due process." Mot. at 9 (citing *Armstrong v. Meyers*, 964 F.2d 948, 950 (9th Cir. 1992). The factors to be considered in determining whether a particular procedure satisfies due process are (1) the private interest that will be affected, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional procedural requirements would entail. *Armstrong*, 964 F.2d at 950 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The Ninth Circuit has recognized that a public employee's "interest in keeping his job is substantial." *Armstrong*, 964 F.2d at 950 (citing *Loudermill*, 470 U.S. at 543 ("the significance of the private interest in retaining employment cannot be gainsaid")). While the Court does not take this interest lightly, Plaintiff has provided no facts that the procedures put in place by his Union's MOU with the City deprived Plaintiff of this interest. Instead, Defendants provided Plaintiff full notice and the grounds for his proposed termination, then three opportunities to be heard before finally terminating him according to the terms of the MOU. *See Walls*, 653 F.3d at 968 ("the root of [the pre-deprivation hearing] is that an individual have the opportunity to be heard before he is deprived of his property interest.").

Plaintiff focuses his argument on the Step 4 arbitration, calling it "illusory" and "a sham."

Opp. at 5. But this argument ignores that courts have found that procedural due process was satisfied even without such arbitration procedures. *See, e.g.*, *Armstrong*, 964 F.2d at 949, 951 (finding that the grievance/arbitration procedures set by plaintiff's union's collective bargaining agreement, which provided plaintiff with two informal pre-deprivation hearings but not arbitration, comported with procedural due process requirements); *see also*, *Winston v. United States Postal Serv.*, 585 F.2d 198, 208 (7th Cir. 1978) (finding that procedural due process was satisfied with a three-step grievance process with appeals with successively higher levels of management, but no arbitration hearing)*; Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3d Cir. 1983) (the right to ask union to take grievance to arbitration provided an adequate due process safeguard). Defendants provided, and Plaintiff fully utilized, procedures ensuring pre-deprivation due process. As such, the Court **GRANTS** Defendants' motion for summary judgment on this claim.

**C.     Substantive Due Process Claim**

Plaintiff additionally asserts that he was deprived substantive due process because he was blacklisted from his chosen profession. Opp. at 6. According to Plaintiff, this occurred in two ways: (1) because he was on a list of problem drivers with the City and County of San Francisco (*id.*, *citing* Dkt. No. 32, Ex. B, Declaration of Roy Flugence in Opposition to Motion for Summary Judgment ("Flugence Decl.") ¶ 8); and (2) because Plaintiff was unable to get hired by other agencies after his separation from SFMTA, a fact from which he argues "clearly, the reasonable inference is that Plaintiff cannot be hired because of something the City has told potential employers." Opp. at 6. The City responds that "there is no evidence that the SFMTA ever attempted to blackball Plaintiff from other employment as a bus driver," and "[t]here is no admissible evidence that Plaintiff was ever places on a mysterious 'list of blackballed' operators prior to being terminated by the SFMTA." Reply at 7. Additionally, the City argues that Plaintiff's contentions about being blacklisted from his chosen profession are undermined by the fact that Plaintiff testified that he was employed as a bus operator at Duck Tour buses in San Francisco. Flugence Dep. 12:2-8.

The Ninth Circuit has held that "there is substantive due process protection against government employer actions that foreclose access to a particular profession to the same degree as

government regulation." *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 998 (9th Cir. 2007), aff'd on other grounds sub nom. *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591 (2008). This is, however, "limit[ed] . . . to extreme cases, such as a 'government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure.'" *Id.* at 997-98 (quoting *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997)). Thus, "a plaintiff must show that the 'character and circumstances of a public employer's stigmatizing conduct or statements are such as to have destroyed an employee's freedom to take advantage of other employment opportunities.'" *Engquist*, 478 F.3d at 998 (quoting and adopting standard from *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 531 (7th Cir. 2000). "It is not enough that the employer's stigmatizing conduct has some adverse effect on the employee's job prospects; instead, the employee must show that the stigmatizing actions make it virtually impossible for the employee to find new employment in his chosen field." *Engquist*, 478 F.3d at 998.

  Plaintiff has not alleged facts showing that his termination from SFMTA made it "virtually impossible" to find new employment in his chosen field. Rather, Plaintiff testified that he had successfully found employment working for "Ride the Ducks Cable Car" and had been working there for eight months at the time of his testimony in December 2012. Flugence Dep. 12:2-8. Although Plaintiff alleges that he had a difficult time finding work, indicating that this was due to stigmatizing actions by the SFMTA, there is not evidence that SFMTA in fact took such actions, or that even if it had, that they were "such as to have destroyed an employee's freedom to take advantage of other employment opportunities." *Engquist*, 478 F.3d at 998 (quoting *Bordelon*, 233 F.3d at 531). Accordingly, the Court **GRANTS** summary judgment in favor of Defendants on Plaintiff's substantive due process claim.

## V.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED on all claims.

**IT IS SO ORDERED.**

Dated: December 2, 2013

_____
Maria-Elena James
United States Magistrate Judge